405 S.E.2d 235

**Rita Susanne ROGERS, Plaintiff Below, Appellant,**

v.

**James Robert ROGERS, Defendant Below, Appellee.**

No. 19895.

Supreme Court of Appeals of West Virginia.

Submitted March 12, 1991.

Decided April 25, 1991.

Rehearing Denied June 6, 1991.

Robin Jean Davis, Hostler & Segal, Charleston, for appellant.

Michael J. Farrell, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for appellee.

PER CURIAM:

The case now before us arose out of the divorce of the appellant, Rita Susanne Rogers, and the appellee, James Robert Rogers. The Circuit Court of Boone County entered an order providing for the equitable distribution of the parties' marital property, finding that the appellee's interest in a certain 117.7 acre tract of land and in a corporation known as "Coal River Coals, Inc." was separate property, and awarding the appellant lump-sum and rehabilitative alimony in the amount of $154,-000. The appellant contends that the circuit court erred in determining that the

appellee's interest in the 117.7 acre tract of land and in Coal River Coals, Inc. was separate property, and that it abused its discretion in limiting her award of lump-sum and rehabilitative alimony to an amount of $154,000. For the reasons set forth below, we shall affirm, in part, and reverse, in part, the decision of the circuit court.

The parties were married on October 22, 1970. Todd, who is now eighteen years of age, was the only child born as issue of the marriage. The parties resided together in Boone County, West Virginia, until on or about March 1, 1985, at which time they separated.

In August of 1985, the appellant initiated an action against the appellee seeking a divorce on the grounds of irreconcilable differences and cruel and inhuman treatment. In his answer to the complaint, the appellee also sought a divorce on the grounds of irreconcilable differences. The Honorable John C. Ashworth was appointed as Special Judge to preside over the divorce proceedings.

Following an evidentiary hearing, the circuit court issued an opinion letter in which it explained that the "nebulous state of the evidence in this case ... concerning value of the marital assets and the indeterminable equity therein, ..., presents the decision making process with a state of fluctuation at this time." The circuit court then determined that an interlocutory order should be entered granting the divorce and ordering, among other things, the sale of the marital domicile and the parties' condominium in Glade Springs. The circuit court further directed the parties to submit evidence assessing the value of their marital property and indebtedness so that an order could be later entered providing for the equitable distribution of their property, and for an award of alimony and support.[1] Both parties filed objections to the memorandum opinion.

1. We observed in syllabus point 1 of *Holst v. MacQueen,* 184 W.Va. 620, 403 S.E.2d 22 (1991): "In a divorce proceeding bifurcation is proper when there is a compelling reason to separate the divorce issue from the related property issues, and neither party will be prejudiced by the bifurcation."

In February of 1987, the circuit court granted the parties a divorce, ordered the sale of the marital domicile and the Glade Springs condominium, and awarded support, on an interlocutory and temporary basis, in the amount of $800 per month for the appellant and $300 per month for the parties' son.

Two additional evidentiary hearings were held after that order was entered. The circuit court then issued another opinion letter in which it observed that the sale of the Glade Springs condominium in 1988 and the sale of the marital domicile in 1989 had produced a marital equity totalling $76,488. The circuit court ordered that the appellant be paid $76,785.50 for her share of the equitable distribution of the parties' marital property,[2] and that she be awarded $2,000 per month in alimony until further order of the court.

The circuit court subsequently issued another opinion determining that the appellee acquired his interest in Coal River Coals, Inc. when he transferred title he held prior to the marriage in a 117.7 acre tract of land to Coal Rivers Coals, Inc. in exchange for common stock in that corporation. The circuit court held that the claimant's interest in both the 117.7 acre tract and in the corporation was separate property. The circuit court further determined that the appellant should be awarded lump-sum alimony in the amount of $100,000, and rehabilitative alimony in the amount of $54,000 to be paid over a three-year period as directed by the circuit court. This matter is now before us on appeal of that order.

I

The first issue to be addressed is whether the circuit court erred in ruling that the Coal River Coals, Inc. property was the separate property of the appellee, and not subject to equitable distribution. The appellant contends that the property transfer-red by the appellee to Coal River Coals, Inc. in exchange for his interest in that corporation was marital property and that she is, therefore, entitled to one-half of the appellee's interest in the settlement proceeds of the litigation involving Coal River Coals, Inc. The appellee maintains that the property transferred to Coal River Coals, Inc. in exchange for an interest in the corporation was acquired prior to his marriage to the appellant. Thus, he concludes that his interest in the corporation is his separate property.

The record before us indicates that prior to the marriage, on April 20, 1970, the appellee purchased an interest in a 117.7 acre tract of land in Boone County from E.E. Lewis for the sum of $1500. Although it appears from the record that the appellee prepared a deed from Mr. and Mrs. Lewis for his interest in the 117.7 acre tract in June of 1970, the deed was not signed by Mr. and Mrs. Lewis until June 15, 1972.

The evidence further shows that the appellee, Mr. Lewis and Bill Owens organized and chartered a corporation in West Virginia by the name of Coal River Coals, Inc. By deed dated April 23, 1975, Mr. and Mrs. Lewis and the appellee conveyed the minerals and mineral rights under the 117.7 acre tract to Coal River Coals, Inc. in exchange for common stock in the corporation. The common stock issued to the appellee was in his name only.

In 1975, Coal River Coals, Inc. instituted a civil action against Cedar Coal Company alleging that Cedar Coal Company had unlawfully and wrongfully removed the coal from the tracts of land owned by Coal River Coals, Inc. The appellee, the appellant, Mr. and Mrs. Lewis, and Mr. Owens were named as individual plaintiffs in the lawsuit. However, in June of 1980, upon the motion of Cedar Coal Company, the appellee, the appellant, Mr. and Mrs. Lewis

---

2. The total sum of the property distributed between the parties amounted to $180,571.00. Included in the sum of $180,571.00 was $76,488.00 from the sale of the marital domicile and Glade Springs condominium, $59,624.00 from the sale of bank stock, $18,000.00 for vehicles, $12,-175.00 for jewelry, $11,284.00 for the appellee's law office, $1,000.00 for property located in Van, West Virginia, and $2,000.00 for the appellant's moving allowance. Prior to the circuit court's opinion granting the claimant $76,785.50 for her remaining share of the marital property, the appellant had already received $13,500.00.

and Mr. Owens were dismissed as individual plaintiffs in the civil action.[3]

Also in 1975, Coal River Coals, Inc. borrowed $35,000 to $40,000 from the Bank of Raleigh to construct a coal tipple. The coal tipple was then leased to Cedar Coal Company.[4]

Although four hearings were held from the time the divorce action was initiated to the time the negotiations of the Coal River Coals, Inc. litigation ultimately resulted in a sizeable settlement, only one hearing focused on the appellee's interest in Coal River Coals, Inc. That was a hearing held on June 12, 1990. The lack of evidence on the record regarding the appellee's interest in the Coal River Coals, Inc. property was primarily due to the fact that the property was virtually worthless until the lawsuit was settled.[5]

Any property owned by either party to a marriage which is found to be separate property is not subject to division under the state's equitable distribution statute, *W.Va.Code*, 48–2–32 [1984]. "Separate property" is defined in *W.Va.Code*, 48–2–1(f) [1986]:

(f) 'Separate property' means:

(1) property acquired by a person before marriage; or

(2) property acquired by a person during marriage in exchange for separate property which was acquired before the marriage; or

(3) property acquired by a person during marriage, but excluded from treatment as marital property by valid agreement of the parties entered into before or during the marriage; or

(4) property acquired by a party during marriage by gift, bequest, devise, descent or distribution; or

(5) property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance; and

(6) any increase in the value of separate property as defined in subdivisions (1), (2), (3), and (4) or in (5) of this subsection which is due to inflation or to a change in market value resulting from conditions outside the control of the parties.

Furthermore, we distinguished passive appreciation of separate property from active appreciation of separate property in *Shank v. Shank*, 182 W.Va. 271, 387

---

3. The only shareholders in Coal River Coals, Inc. were the appellee, Mr. Lewis and Mr. Owens, each of whom owned 100 shares of stock.

4. The appellee was questioned on cross-examination regarding what funds were used to make the monthly payments to the Bank of Raleigh:

Q. Okay. So who made the monthly payments to the Bank of Raleigh in Beckley, West Virginia, during that period of time?
A. Well, during the period of time it was probably taken on a six-months [sic] note and Cedar Coal leased the tipple and by the time that they started dumping there I would venture, I would say that they [sic] were monies deposited in the accounts from the use of the tipple itself.
Q. Do you have any records here today to present to the court reflecting that testimony?
A. No.
Q. From time to time is it fair to say that you and Mr. Lewis and Mr. Owens did in fact make interest payments to the various banks with regard to Coal River Coals, did you not?
A. From the corporate account itself.
Q. And either the stockholders of the corporation or the corporation itself paid taxes all during that period of time?

A. Well, it hasn't paid any taxes I don't think since '77.

5. The appellee paid $1500 for his interest in the 117.7 acre tract of land which he subsequently transferred for stock in Coal River Coals, Inc. The settlement of the Coal River Coals, Inc. lawsuit, of which the appellee was to receive a third after the payment of attorney's fees and costs, was for $6,000,000.

However, the appellee's early belief that the Coal River Coals, Inc. litigation would not prove successful is reflected in his testimony at a hearing held on September 15, 1986:

Q. Coal River Coals is suing Cedar Coal?
A. Yes.
Q. For removal of a hundred thousand tons of coal?
A. Yes.
Q. What's the amount of the (word inaudible) on that suit?
A. It's big.
Q. Triple?
A. Triple. I'll be glad to share it with everybody in here on an equal basis. I don't think it's going anywhere.

S.E.2d 325 (1989). We recognized in syllabus point 1 of *Shank:*

> Passive appreciation of separate property of either of the parties to a marriage, or that increase 'which is due to inflation or to a change in market value resulting from conditions outside the control of the parties,' is separate property which is not subject to equitable distribution. *W.Va.Code,* § 48–2–1(f)(6) (1986).

■ However, separate property which actively appreciates during the marriage can be classified as marital property as we pointed out in syllabus point 2 of *Shank:*

> Active appreciation of separate property of either of the parties to a marriage, or that increase which 'results from (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property, or (B) work performed by either or both of the parties during the marriage' is marital property which is subject to equitable distribution. *W.Va.Code,* § 48–2–1(e)(2) (1986).

■ We have also had occasion to consider the circumstances when a party transfers his or her separate property during the marriage for other property which is titled only in that party's name. We observed in syllabus point 3 of *Hamstead v. Hamstead,* 184 W.Va. 272, 400 S.E.2d 280 (1990):

> When an individual during marriage has property which is separate property within the meaning of *W.Va.Code,* 48–2–1(f), and then exchanges that property for other property which is titled in his name alone, and which is not commingled with marital property, then that other

property acquired as a result of the exchange is itself separate property.

■ It is clear from the record that the appellee acquired his interest in the 117.7 acre tract of land on April 20, 1970, prior to the parties' marriage.[6] Furthermore, there is no evidence that when the appellee exchanged his interest in the 117.7 acre tract of land for corporate stock that it was commingled with marital property. Moreover, there is no evidence in the record which indicates that marital funds were ever used to pay any indebtedness on the property or the corporation. It further appears in the record that the increase in value of the separate property was attributable to passive appreciation rather than active appreciation. The sole reason the property's value increased was because Cedar Coal Company unlawfully mined the coal underneath the property, and the appellee and the other corporate stockholders were successful in their lawsuit against Cedar Coal Company. Clearly, the increase in value of the property was due "to a change in market value resulting from conditions outside the control of the parties" under the provisions of *W.Va.Code,* 48–2–1(f)(6) [1986]. Therefore, the appellee's interest in the proceeds from the litigation involving Coal River Coals, Inc., which interest he acquired when he transferred his separate property to the corporation in exchange for stock in his name only, was not subject to equitable distribution.

## II

Next is the consideration of the question of whether the circuit court abused its discretion in awarding the appellant $100,000 in lump-sum alimony, and $54,000 in rehabilitative alimony. The appellant contends that because of the disparity in income and

---

**6.** The appellant argues that the appellee did not receive legal title to the Coal River Coals, Inc. property until the deed was recorded on June 15, 1972, and that the property is a marital asset since the recordation of the deed did not take place until after the parties were married. However, as pointed out by the appellee, the purpose of recordation of a deed is to protect a bona fide purchaser of land as we stated in syllabus point 2 of *City of Bluefield v. Taylor,* 179 W.Va. 6, 365 S.E.2d 51 (1987):

> 'The purpose of [*W.Va.Code,* 40–1–9 [1963]] is to protect a *bona fide* purchaser of land against creditors of the grantor, and against other persons to whom the grantor might have undertaken to execute title papers pertaining to the land embraced in the recorded instrument.' *Bank of Marlinton v. McLaughlin,* 121 W.Va. 41, 44, 1 S.E.2d 251, 253 (1983).

income-earning capacity of the parties, and the financial realities of the parties, her award of alimony should be substantially increased. The appellee maintains that the circuit court did not abuse its discretion, and that there is no basis for a reversal of the lump-sum and rehabilitative alimony awarded to the appellant.

*W.Va.Code,* 48-2-16(b) [1984] provides, in relevant part, that circuit courts should consider the following factors in determining the amount of an alimony award:

(1) The length of time the parties were married;

(2) The period of time during the marriage when the parties actually lived together as husband and wife;

(3) The present employment income and other recurring earnings of each party from any source;

(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market and custodial responsibilities for children;

(5) The distribution of marital property to be made under the terms of a separation agreement or by the court under the provisions of section thirty-two [§ 48-2-32] of this article, insofar as the distribution affects or will affect the earnings of the parties and their ability to pay or their need to receive alimony, child support or separate maintenance;

(6) The ages and the physical, mental and emotional condition of each party;

(7) The educational qualifications of each party;

(8) The likelihood that the party seeking alimony, child support or separate maintenance can substantially increase his or her income-earning abilities within

a reasonable time by acquiring additional education or training;

. . . .

. . . .

. . . .

(12) The tax consequences to each party;

. . . .

(14) The financial need of each party;

(15) The legal obligations of each party to support himself or herself and to support any other person; and

(16) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of alimony, child support or separate maintenance.

In reviewing the circuit court's determination of the amount of alimony to be awarded under *W.Va.Code,* 48-2-16(b), this Court must consider whether the circuit court abused its discretion as we stated in the syllabus of *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977):

Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.

In the case now before us, the circuit court recognized that the dissolution of the parties' fifteen-year marriage was attributable to the conduct of the appellee. The circuit court observed that the appellant, as a result of the divorce, lost her home and the affluent lifestyle she enjoyed throughout her marriage.[7] The court also observed that although the marital estate was plagued with indebtedness at the beginning of the divorce proceedings, the appellee was to receive a settlement from the Coal River Coals, Inc. litigation "reaching

7. The circuit court made the following observations in its opinion dated August 3, 1990:

This marriage lasted fifteen years until the defendant undertook to conduct himself in such a manner as to precipitate the dissolution of that marriage.

When that occurred his wife eventually lost her home, in which she had provided or directed homemaker and child care services,

and has since had no real home to call her own.

Before the enjoyment of her marriage was disrupted, Ms. Rogers had security, prestige, [a] vibrant social life and the full advantage of travelling and recreational high standard of living and the company of family and mutual friends.

into seven figures." The circuit court further observed that the appellant has only a high school education and, at her age, had no special training or work experience.[8] Surprisingly though, after making these sympathetic observations with respect to the appellant's financial position and emotional state as a result of the parties' divorce, the circuit court only awarded the appellant lump-sum alimony in the amount of $100,000, and rehabilitative alimony in the sum of $54,000.[9]

There are several factors in the record before us which support an award of alimony greater than the award ordered by the circuit court. First, the parties' fifteen-year marriage dissolved as the result of the actions of the appellee. Second, the appellee, an attorney who has enjoyed a reasonably successful legal career, has a far greater income-earning ability than the appellant. The appellant, who is 41 years of age, has only a high school education and the likelihood that her income-earning ability will substantially increase is doubtful.[10] Third, there was little property for the circuit court to distribute to the appellant upon the dissolution of the marriage, due to the indebtedness of the parties' marital property which resulted from some of the appellee's failed business ventures.[11] In fact, the appellant has no home because the marital domicile had to be sold to pay part of that indebtedness.[12] Finally, the appellee is in a substantially greater financial position than the appellant since he received a sizeable settlement from the Coal River Coals, Inc. litigation. The appellee, therefore, is financially able to pay the appellant the alimony necessary to help her establish a lifestyle almost commensurate with that she enjoyed throughout her marriage to the appellee. For these reasons, we believe that the circuit court abused its discretion in limiting the appellant's award of alimony to a lump-sum amount of $100,000, and in awarding rehabilitative alimony in the amount of $54,000.

However, rather than remand this case to the Circuit Court of Boone County to determine a more appropriate alimony award and cause the parties to undergo further litigation, we shall set the award of lump-sum alimony based on the facts in the record before us. Instead of awarding the appellant any rehabilitative alimony, we believe that the appellant should be awarded lump-sum alimony in the amount of $254,000.[13] This alimony can be paid from the funds ordered by this Court to be placed into a federally-insured interest-bearing account. We believe that this lump-sum payment will disentangle the parties from one another as quickly and cleanly as possible.

8. The circuit court made the following observation:

> While this lady much used to fine things was able to make a decent income by her election to the Boone County Commission and her work for the Governor ... for which she is to be complimented, those opportunities will be gone and without political glow will fade away.

9. The circuit court stated in its opinion:

> She should not lose husband, home, happiness and hope by all that has gone on here, and stand without anything but the bitter memory of the way things were and should be in the tidal wave of a de novo prosperity.
>
> For all the reasons herein stated, this court does [not] consider any of the support guidelines as being of any real value or application in determining the question of plaintiff's alimony.
>
> Plaintiff will need to acquire a reasonable new home commensurate with some modicum of the standard of living she once enjoyed and once looked forward to.

10. We note that the appellant also has a real estate license and a broker's license, but is not currently employed.

11. For example, the appellee invested in a wine distribution business during the marriage which suffered a loss of more than $700,000.

12. While the appellant was selling the marital domicile to pay off the indebtedness of the marital estate, the appellee in the meantime purchased a home in Charleston for $175,000, and a condominium in Myrtle Beach, South Carolina, for $125,000.

13. The appellant needs sufficient funds to purchase a new home. The parties had placed a value on the marital domicile of approximately $250,000, although the house only sold for $175,000 due to the depressed real estate market in Boone County. The condominium the appellant has considered purchasing costs approximately $150,000. We believe the $254,000 will enable the appellant to purchase a home, and also, if invested properly, provide her with the means to live almost as well as she did while married to the appellee.

The lump-sum alimony award will assist the appellant in purchasing a new home and in establishing a standard of living almost commensurate with that she once enjoyed.

This Court also wants to point out that we are aware of the provisions of I.R.C. § 71 (1988) and the tax advantages of qualifying alimony payments under that section. *See* J. Cunningham, *Creative Tax Planning for Divorce Settlements—Using Section 71 Payments to Advantage*, 69 Mich.B.J. 122 (1990). Accordingly, the parties may agree to any arrangement for the payment of alimony other than the lump-sum plan and present the agreed plan qualifying under I.R.C. § 71 (1988) to the circuit court for entry as an alternative to the lump-sum payment.

Thus, for the reasons set forth herein, this Court is of the opinion that the final order of the Circuit Court of Boone County should be affirmed, in part, and reversed, in part.

Affirmed, in part;

reversed, in part.

MILLER, C.J., deeming himself disqualified, did not participate in the consideration or decision of this case; Judge THOMAS H. KEADLE was assigned to sit as a member of this Court under *W.Va. Const.* art. VIII, § 3.